We are here today because my client, in an effort to protect himself, his property, and a minor that was inside his house, was out on his front porch on his own property with a lawful handgun, not raising anybody or not doing anything, but just waiting for the possibility that someone was coming to harm them. That's what it was. What actually arrived was a voice from the dark, and using their language, it said, I'm going to shoot your ass, mother ever. And that was the officers, whom had not come up in a car, they had parked down the street, they didn't come up with any lights, they didn't come up with any announcements. They came up with nothing except, in darkness, 90 feet from my client, sitting lawfully or standing lawfully on his porch, and they fired a weapon at him. During the end of his sentence, it says, this is my property, get off. That's why we're here. There are several issues that we had appealed in regards to this case. I'm going to go through them relatively fast. The first one was in regards to the county's 12B6 motion that was filed at the beginning of the case. And it was dismissed on the first pleading that was filed as a 12B6 motion for failure to state a claim. I briefed in ad nauseum, I think, in regards to Leatherman and its applications, as you read the records that I've presented, but, you know, the Supreme Court, when it came out with Twombly and Iqbal, a lot of courts have the opinion, some do, some don't, that it relatively changed the face of pleading. My assertion that it did not at all. Leatherman was a case that came out in which this court was reversed in regards to a dismissal on the pleadings under Monell liability. The Supreme Court in Leatherman specifically said that there is no heightened pleading standard in regards to that, and this court, saying this court, and perhaps some others were wrong in that regard, that it is a Rule 8 notice pleading. Nothing that's really transpired after Leatherman has overruled Leatherman or really even addressed anything other than adding to it some plausibility standard. We know that in Iqbal, that was in the face of after 9-11 and there were some detainees that were suing the director and the attorney general, or the former attorney general, in regards to what was transpiring at the facilities under federal law. Well, they were in the Bivens action. They were suing individuals. You can't sue the individuals under the Federal Tort Claims Act, so you have to go under a Bivens claim. What are you talking about? Are you talking about suing the county or are you talking about suing the individuals? In regards to this, we're going to be talking, right now we're just talking about the county, but I would just show pointing out that Iqbal is a case that was talking about, look, there needs to be some plausibility standard in regards to it. You need to allege some facts. We need to make it plausible that this person individually could have done something. That's the purpose of Iqbal. But as far as Monell liability is concerned and the necessities of pleading that, not forming for anything for purposes of summary judgment, for the pleading standards, which have not changed under Rule 8 or anything else, it's not accepted out, it is still a notice pleading in that regard. And it needs to be plausible. And in this case, I would assert that a case in which the officers creep up in the middle of the night to do an investigation, they weren't there to arrest anybody. They were there just to investigate and see what was going on. Their training is that they don't announce, they don't tell anybody who's there, and they don't even attempt to allow somebody the opportunity to say, who are you? That is what this case is about. And I would proffer to the court, as I did in the responses to the motions to dismiss, that if given a chance for discovery, we would have determined whether or not their policies and would have sufficed for summary judgment material. There's a difference between pleading. There's a difference between argument for purposes of summary judgment. And the judge should not have dismissed the, on 12B6, the county out of the case at that point. I would point out that there were some other cases that came out from the United States Supreme Court after Twombly and after Iqbal that did not mention anything about Leatherman being changed, and in fact found Monell liability even on the bare base facts of those pleadings. There are, and I cited to, I think, half a page of courts that have similarly done so. And I think that the reading of Iqbal and Twombly is incorrect in regards to its application to Leatherman, and it didn't abrogate it. So the pleadings in regards to this case were sufficient for the judge to deny their 12B6 motion. If there's any questions, the second issue we have is in regards to the summary judgment evidence. I don't know that at the end of the day it makes much of a difference since the defendants in the case acquiesced and said, we understand there's a fact issue in regards to whether a weapon was raised at all. And their point being that it doesn't matter if he ever raised the weapon at all, they'd still be justified in shooting him. They're basically arguing to the court that it's clearly established law that officers can shoot you if you have a gun. No, they don't have to show clearly established law to support their position. You have to show a clearly established violation of constitutional rights. In your introduction, you gave a compelling view of the case from your client's perspective sitting in that chair, but we have to view it, while we take the factual disputes in your favor, we have to view it from the officer's perspective. I mean, they're walking up on this house, they know your client was drunk, he'd been in a physical altercation with his girlfriend, and they see him holding a gun by his side, and five times they ask him to drop it and he doesn't. So why isn't it reasonable for them then to use force? I think the problem is, in the Casella cases and other ones, are when officers have come up and they're obviously officers. They've announced their presence, anything of that nature. You're talking about from a hundred feet away in pitch dark, some officers who have not identified themselves, have not said anything about we have any questions for you or anything else. The only thing they've done is say that they're going to shoot him and call him names, which led him to believe that there might be somebody that was there to harm him. He'd said he was going to go after them, right? No, he did not say that. At one point he arrived and he said, stay off my property, get out of here. Then they said, I'm going to shoot your ass, MFR. And then he again, they said, we're going to shoot you, and he said, well, go ahead, it's my property. But he didn't say anything to them, he didn't threaten them, and he didn't raise his gun as far as the summary judgment evidence is concerned. At what point in the conversation that you are telling us about now did they say drop it five times? I don't know that they said drop it five times on the video that was submitted as part of this. There was a lot of yelling at some point. All I know is that they said, you know, we're going to shoot you. He said, this is my property, get out of here, get off of here. And he was finally shot five times at the time when he was saying, this is my property, get out of here. So I don't know that they, and they never once announced who they were. I personally would, you know. I have the impression that it was undisputed, essentially undisputed, that he, that he had been told five times, drop the weapon before they actually fired. Well, I think the question is who asked him to do that? If I am legally at my property with my legal gun, and I have a Second and First Amendment right to tell people to leave and to bear arms, I have the right to defend myself and to defend my property, and somebody who has not identified just comes up and starts cursing at me and telling me that they're going to kill me, why would I put my weapon down? Why would I have to do that? That's one of the, that's one of the failures in regards to their case, and I think that's why this is so much different than a lot of the cases that have been looked at before. But again, you're looking at it from your client's perspective, and these officers are walking up with the female girlfriend, you know, whatever she was, you know, worried about her safety, and they tell him five times to drop it. They know he's drunk. They know he's been violent that evening, and he doesn't drop it. I mean, aren't they reasonably viewing themselves to be in danger? I don't think so, Your Honor. I think there's a lot of factors that come into this, and one of the biggest factors is the fact that they changed their own testimony. If you just look at one of the officers that actually fired, originally he stated in there that my client had pulled the gun up, and then he put it down, and then he pulled it up, and he put it down, and then he pointed it up, and that's when they shot him. But that's not true if you look at his trial testimony. It's also part of the summary judgment evidence as well. What it is is an officer who shot at somebody without really probably even seeing the gun, because the other two persons who were even closer than him didn't see anything raised at all. Didn't even see a gun. Not somebody that gets caught in a bad ... Did your client testify that he was never told to drop it? I believe at the criminal trial he testified about what the video said, because they played the video, that they told him that they were going to kill him, and he said, get off my property, and that somebody yelled at him to put it down, and he didn't. But again, just because somebody out of the blue or out of the darkness says to put your weapon down without identifying who they are ... Do you have a hierarchy for that argument? Yes, Your Honor. I mean, if you look at the two cases that I cited in there, the McDonald case, which is 561 U.S. 742, and then also the Columbia case as well in the same part, we're looking at the First Amendment and the Second Amendment. You know, under Texas, you're looking at the right to defend yourself and defend others under 931 and 932 of the Penal Code, 941 and 942, also deal with the defense of property. So yes, he has the right. Look at the holdings of those courts that you rely on. Is that the right to bear arms and actually bear them is part of the right under your Second Amendment. Nobody denies that. And so he was lawfully at his home. They had not announced. Nobody denies that. Well, and the important is, in regards to the officers, this Court has held many times is that one of the things that you're weighing in the factors in regards to gram factors is always going to be whether or not it was an escalation. To what effect did that escalation go from zero to 100? And an escalation that begins with negotiation and immediately goes to excessive force usually weighs against the defense in regards to the qualified immunity analysis under gram. In this case, there is no negotiation. They started at excessive force. They started at deadly force. The only thing that precipitated that from anybody's perspective is really just saying that they're going to kill him. He had not threatened anybody. You're never going to see anything in the record with them saying that. I'm sorry, Your Honor. He had a gun. I mean, how does the officers know that he was not going to pull it up immediately and shoot? That's the point. I mean, and that's the general rule is if you, if an individual has a gun and he's told to drop it and he doesn't drop it, then force may be required or is required or can be required, legally required to, for the police to react. I think maybe given perhaps other circumstances, but I think that's a very tricky thing to argue. It's a very dangerous thing, especially as they... I'm not arguing. I'm telling you what the case is old. Well, I mean, anybody who is carrying a weapon can at any point shoot, but without any kind of threat and just holding a weapon, many people go outside and we have the right to carry, which means anybody who's on the street can be shot. And I don't think that's what... Here's the five warnings, the five drop-its. I think the key here is that they don't announce who it is. They don't say anything about anything. And I think that's one of the differences in regards to the case. I mean, there is a numerous imminent harm factors, and I know that in Casella there's some discussion regarding that as well, but it's found in Cole versus Hunter and Reyes case, a long line of cases in the Fifth Circuit that have talked about that, dealing with knives, guns, what have you. It is a very tricky thing for us to say that there is going to be qualified immunity whenever anybody has a weapon, because anybody who has a weapon could at some point possibly maybe use or try to use that weapon. I think what we're saying is, if that's true, is that it's clearly established that you can shoot anybody who has a weapon, period. And that's not what the case law is in any respects. Where was your client hit? I mean, with that many shots, I'm surprised he survived. I believe he was shot at nine. He got hit with five. He did survive. What part of his body? He lost a finger, he hit his arm, he's permanently disabled in his leg. I think it also punctured his kidney, if I'm not mistaken. He was in ICU for a couple of months, in and out of coma. So he's alive now, at least that's a good thing, but this case is very difficult. I would say I've reserved a little bit of time. But in regards to the qualified immunity, I think going through the harm analysis, as I briefed in that, you know, in regards to the severity of the crime, they were only investigating him, they were going up there, even if you kind of call that an even one. When you're talking about the immediate threat or anything of that nature, the case law is pretty clear when you go through everything, that there really wasn't any kind of threat whatsoever. And all of the cases that were cited by the court in the analysis for its order, cited to cases that were factually just completely insufficient, you know, where a guy had fired his weapon up several times in the air and then aimed it at the officers, or was reaching into his boot after threatening to kill officers, and, you know, those are not the facts, or even possibly related to this case. When you add that with the act of resistance, which is the third element of the Graham factors, what you see is just something that the Graham factors would weigh against granting qualified immunity, and that's what we'd ask you to find. With that said, this is my 26th trip here to Argoo. I always enjoy it, but I reserve a little bit of time, but I hope you'll all take that under advisement. Thank you, Mr. Gale. Mr. Cullen? May it please the Court, I'm Kevin Cullen, law firm of Cullen, Carstner, Searden & Cullen in Victoria, Texas. I represent Defendant Scudder and Defendant Sheffield, who are the individual officers involved, as well as Aransas County, who was the Sheriff's Department that they worked for. I'm not going to talk initially about the motion to dismiss or Rule 804, the exclusion of the evidence, until we finish with the qualified immunity. If y'all want to talk about those things, you tell me and I'll talk. But Judge Costa hit the nail on the head in this case. We're not talking about whether or not Mr. Ratliff was negligent, whether he was at fault, whether he did something wrong. What we're talking about here is did Officer Scudder, at the moment that he fired the shot, did he use excessive force? And what the case law says is that's the only moment in time that you look at. What did he know? Did he have a reasonable belief that there was immediate threat to his safety or the safety of others? Judge Ramos, in the District Court, after reviewing the evidence, said yes, that's exactly the case. As a matter of law, I'm making this decision as a question of law and saying that the force that Scudder used in shooting Mr. Ratliff was not objectively unreasonable, given the circumstances that he faced and the information that he had at that time. And I want to go over... But of course, he knew at that time that the officers had not identified themselves as officers. That is correct, Your Honor. So that needs to be factored in, does it not? No, it does not, Your Honor. The court looks at the Cass case, I believe it's Cass v. City of Abilene, and was actually cited by the plaintiffs in their trial brief, cited by us as well. And the course looks at Harris v. Serpas, which is, if I've got that one right, it involved the City of New Orleans Police Department. And those cases talk about conduct of the officers in creating a dangerous situation. And what this court has held is that in the qualified immunity context, evaluation in the Fifth Circuit, we don't look at any of the factors leading up to what happened to the incident. We look at what the officer knew at the moment he fired the shot. But again, my question was that the officer did know at the moment he fired the shot... That he hadn't identified himself. ...that he had not identified himself, nor had his... I would agree with that. I would agree with that, Your Honor. I mean, we have an audio tape and a videotape. It didn't happen. They didn't say, Sheriff's deputies, would it have been better had they said Sheriff deputies? Of course. Would it have been better if we'd said police?  Were they negligent? He should have dropped the gun. I'm sorry? The whole thing might have been avoided. Were they negligent? He might have been saying he might have dropped the gun. Because weren't the police even told, she said, told the police, he's afraid my people are going to... No. That was just from him. No. No. There's no evidence of that. And number one, there's no summary... Someone said that. The plaintiff said that he thought her family was going to come after him? The plaintiff believed that. The plaintiff testified either in his deposition or perhaps even in the criminal trial, but that he, his girlfriend, fiancee, Ms. Van Adder, had an ex-boyfriend he'd had trouble with, members of the Mexican mafia, and he was worried they were showing up. Again, the officer knows nothing about that. When the officers walk up, they have a felony assault suspect, third-degree felony assault suspect who they know has been drinking all day, who threw his fiancee down on the floor, choked her to the point where she thought she was going to die, and had an 11-year-old child in the house, her child. That's all they knew. That's all they knew when they walk up to the house. The first thing that happened, and the first statement made by anybody that you hear on the video is a statement made by Mr. Ratliff, and this is a 21-second time frame, and it starts it, when you look at the videos, at 28, whatever the 28 is. And he says, get the F off my property. That's what he says before the officers say a word. Five seconds later, he says again, get the F off my property. Officers haven't said anything yet. At the same time that is happening, Ms. Van Adder says, he might have a gun. He could have a gun. The officers have walked up. I'm sorry? Where is she at that point? Standing beside him, behind him. The two officers are walking down the street. I believe the testimony is they kind of had their flashlights. It is dark. She is standing a few feet behind them. Behind the police? Behind the police. Yeah, behind the sheriff's deputies, yes. And so they don't have their guns drawn. They're going up to do, as Mr. Gale said, they're going up to do an investigation. Hey, what happened? Let her get her clothes out of here. Let her get her son out of here. There were no lights or anything like that? The lights were not, the above red and green or red and blue lights were not flashing, no. Again, it wasn't their intent at that time to go arrest him. Now, they might have ended up arresting him, depending on what he says happened, et cetera. But as they, so at that point in time, they don't know anything about a gun at all. So at 33, some 16 seconds before the shot is fired, they pull out their weapons, having been told he's got a gun and he's yelling at them. And he has a flashlight on the weapon. They shine it on him, and sure enough, he's got a gun. The officer says, hey, drop it. Another officer, that was Scudder. Sheffield says, I'm going to effing shoot you, mother eff. Scudder says, put your gun down now. To which Ratliff responds twice, shoot me, just shoot me. Again, now we've got, now, and that's only five seconds into the discussion about, oh, he's got a gun and we're telling him to drop it, and we've told him to drop it twice, and we've told him we're going to shoot him if he doesn't. He says, just shoot me. So now the officers know that they've got a suspected felon, they've got, who's been drinking all day. He now has a gun. He's telling him he isn't going to drop the gun. We know he's heard that he's been told to drop the gun because he's responded, just shoot me. And so he's clearly irrational, unpredictable. And he doesn't know that they're officers. He doesn't know that they're officers. That's correct. So let's take two different factual situations. One in which everything that happens- Let me back up, Judge. No, no. I'm asking the question. I missed it. Excuse me. I'm asking the question. I'm sorry. Let's take two different factual situations. One which is what actually happened on the scene here, that is to say we have officers who were officers but did not identify themselves. Let's take a separate factual situation in which there were never any officers on the scene, but only some strangers who arrived on the property who, under the facts, were not peace officers of any kind. Let's take those two factual situations. Now, from Mr. Ratliff's point of view, it makes no difference in terms of how he acts, correct? Because he doesn't know they're officers. Okay. So at what point then, in either of those situations, does Mr. Ratliff do something under Texas law that justifies his being shot? The question is, from the view of the officers, without regard to whether they have created a dangerous situation, without regard to whether they have acted negligently in not identifying themselves. In the Cass case, for example, when the officer shot Mr. Cass, he had not identified himself as a police officer. He wasn't wearing a SWAT outfit that had police or law on it. He had a badge, but it was on his hip, and it was on his hip on the side away from where Mr. Cass came out of the door. Mr. Cass came out of the door with a gun, and he shot him. And this court, the Fifth Circuit, said, as a matter of law, that shooting was justified. We are confined to looking at the facts from the perspective of the officer only. What was the gun raised in that case? Because that was an immediate danger. Yes. Yes. Yes. Yes. Yes. Yes. You might not have time to identify. Again, in a less amount of time. But those cases, Harris and Cass, stand for the proposition that you don't look at this from the perspective of the plaintiff, the appellant in this case. You look at it in the eyes of the defendant who is accused. The courts say that we recognize that law enforcement people are faced with tense, uncertain, and rapidly evolving facts, and that it's not fair to second-guess them using 20-20 hindsight. Hey, it would have been better if we'd have identified ourselves as police officers. It would have been better. It would have been better. And they may have been negligent in doing that, but that's not the standard. It's not a standard of negligence. It's not a standard of gross negligence. It's a standard of deliberate indifference. All but the plainly incompetent who knowingly violate the law. We don't have that fact situation here. And that's why Judge Ramos determined that under the facts, as they were presented and he had a reasonable belief that the shooting was justified. He could be mistaken in that. He could be mistaken in his belief. But he had a reasonable belief, and that's the standard to use in qualified immunity. I think there's a- What if we concluded that it was unreasonable for them not to identify themselves? How does that affect your analysis? I don't think, Judge, that in the light of Cass and in the light of Harris. In Cass, they're serving a search warrant, and they go in with SWAT gear. And in that case, it's the same thing. The plaintiff said, you know, they created this situation. You could argue that we, that Scudder and Sheffield created this situation by not identifying themselves as police. And the Fifth Circuit said, we don't look at that. We only look at it for the eyes of the police officer at the time he fired the shot. The same thing in Harris. Harris was here in New Orleans. His wife believed that he had overdosed and was locked himself in the bedroom. She called 911. The police came. They've got SWAT gear. They've got tasers. She gives them the key. They can't get into the bedroom because he's barricaded the door. They bust into the door. They find him laying in the bed under the sheets. They yell to him. We can't see- You know, uncover yourself. We'd show us your hands. He doesn't do it. They pull the sheets back. He's got a knife. They've got guns, and there's multiple ones of them. They tase him. The taser doesn't work. They tase him again. The taser doesn't work. He then reaches up with a knife, and they shoot him and kill him. And the court said, we don't look at the conduct of the officers. Did they escalate the situation? Should they have ever barged into the room? Should they have ever tased him? What we look at is, at the moment that we fired the shot, was there a reasonable threat of imminent harm? And there was a reasonable threat. In the case- I'm getting these warnings about- I've seen the video, but it's a little hard to tell. How far away were they from the plaintiff? The testimony is 90 feet. And what I would say, Judge, insofar as the distance is concerned, that the telling factor that they were within the danger zone, if you will- But I'm also just trying to figure out if they- what the officers would have perceived. Did they think he did see them as law enforcement or not, or given the distance? Right. We don't- It was dark, right? But they- It was dark. Very dark. It was dark. You know, we believe that they knew we were officers, but we don't- we can't prove that and he hasn't testified. I mean, we were in uniform. Our cars had driven down the street. Their headlights were on. We're across the street talking to the fiancé. We've come walking up with flashlights. If he says he doesn't know, then that's an- we can't controvert that other than say, well, we think he did, but I can't- You can't controvert what he knows, but I guess I'm saying what did the officer perceive is the- Right. What the officer perceived is he's got a gun. We've tell him to drop it five times. In a 16-second span, he refuses and he says, just shoot me. Under those circumstances, the officer was reasonable, had a reasonable belief there was immediate fear of a threat of imminent harm. And clearly, we were in a range where there's a danger zone or we wouldn't have been able to shoot him. I mean, if we could shoot him, he could shoot us. That summary judgment evidence that is uncontroverted from Officer Scudder is that I had a reasonable fear that he was going to be able to harm me or Sheffield or Ms. Van Ander. There's no evidence- Is it indisputable- There's no evidence to the contrary. Is it indisputable that it was so dark that he could not see them? Undisputable. No, because, I mean, I believe he could see us. Our officers believe he could see us, but I mean, he says he didn't, so I would say it's a, it is not a, an established fact germane for summary judgment. It's a disputed issue as to whether he knew we were police officers or not. I, I, I'm- So everybody concedes that it was dark, there were no lights, there were only flashlights, there were lights, I guess, in his trailer, on the porch of his trailer? I think, I think that those, those facts are correct, Your Honor. That it, everybody concedes it was dark. How, how late at night was it? How late at night was it? Three a.m.? Now, you know, that's, that, that's another point, and again, I, I, I'm telling you, you're only to look at this from the officer's perspective and only what the officers know, but at the same time, at the same time, the testimony from Mr. Ratliff is, I got my gun and I went out on the porch in an attempt to scare people off if they showed up. I mean, again, my officers don't know that, but, but the point of what, what his intent was was exactly what happened. He scared the heck out of my officers when they put the flashlight on him and he's got a gun. There's another aspect of qualified immunity, and we've briefed it and the Supreme Court has talked about it too many times to mention in Casella, in Mullenix, in White v. Pauley, that the other aspect of qualified immunity is, was the case law clearly established? Was it established with particularized facts so that every reasonable peace officer in this country would know if he's in Scudder's shoes and he's faced with these facts and he tells somebody five times, a drunk, felony assault suspect, to drop his weapon five times and he says, just shoot me and won't drop his gun, that every reasonable peace officer in this country would know, oh, if I shoot him, I'm violating his civil rights. That's what clearly established law says. That's what Casella and Hughes and ... But the test would be a little even stricter than that in your favor, that is to say that there would have to be clearly established law that all of that existed in a case in which the officer didn't identify himself, right? Correct. Correct. You'd have to have, you'd have to have case law that squarely governs the facts of this case and, and it is the burden, the Supreme Court has said countless times, it is ... We know, we know all that. We understand all this. I know, but it's the appellant's burden to point out a case and he hasn't pointed out a case, still don't have a case, he didn't point out a case in district court, he didn't point out a case here, he didn't even brief the issue before this court. And so since I have moved, we moved for summary judgment on both of those elements of qualified immunity and we have briefed both of those elements of qualified immunity, even if, even if this court finds that Judge Ramos was in error when she granted the qualified immunity based upon there was no, there was no violation of a constitutional right, then what you're really doing, if you don't say, is you're, you're holding my officers to a higher standard than we're holding Judge Ramos to. If Judge Ramos doesn't think this is a constitutional violation, with time for deliberation, with an, at briefing attorneys, with review of the case law, with a legal education, with all the facts laid out before her, if she doesn't think under those circumstances that this violates clearly established law, how in the world is Officer Scudder and all the other thousands of officers supposed to say, well, you know, Judge Ramos is wrong about this and I can't, I should know. I'm plainly incompetent for not knowing that law. Thank you very much. Mr. Gale, you saved time for rebuttal. Why don't you focus on the, on the clearly established law just to show us what's your, what's your best case? First of all, in regards to the court's order, in regards to the qualified immunity, the clearly established part was not part of the analysis at all. It was completely skipped over. You're saying the district court? Yes. Because she found at the first prong it wasn't a constitutional violation. Yeah. So, I mean, but when counsel says, but when counsel says if, if Judge Ramos believes this wasn't clearly established, then it must not be. If she doesn't believe it's a constitutional violation, then how can it be a clearly established law? That's different. And that's why we briefed specifically the Graham analysis in regards to the severity of the crime, the immediate threat. All of those things that went into the analysis for making a determination whether a qualified immunity applied and there wasn't a constitutional violation. But the clearly established portion, I did mention it in a footnote because I said, look, this was not part of the order. I don't have the ability to appeal from an order that isn't given in regards to that, but we did address it. You've got numerous cases, and counsel keeps saying, well, you don't have cases that show that they would have some sort of notice. You would have notice that people have the right to bear arms. You have notice that the people have the right to protect their property. You have notice of many things that they violated in regards to this case. And I think you're correct. I think it's unreasonable not to announce if you know somebody is not committing anything and is not pointing that weapon. I mean, suffice it to say, in regards to the analysis of qualified immunity, we have fact issues. There are fact issues from which a jury could make a determination that qualified immunity does not apply in this case. And then I think Judge Ramoson and the judge— Again, in terms of clearly established law, which case clearly establishes what you just said, which is that it's unreasonable for the officer not to announce himself? In regards to the cases that have been before this Court, and there's the Doss case, which is cited in my brief, that's from 2015, and also the Zoss, Doss and Zoss, both of those are cases that deal with the escalation of negotiations to force and what transpires. So when you're looking at it from the analysis, it is part of the analysis to take into consideration what was done. Now, their reliance on Cass and Harris is a little misplaced. I think they're going a little far in regards to the issue in saying that this Court has said that it does not matter in the slightest any facts that developed or have anything to do with any of the analysis here, except just what was going on with the officer at the time. I think that's an incorrect analysis, especially with Harris. Because in regards to those cases, there was other factors that, yes, there were some allegations that had not followed certain procedures with knock and announce and renouncing their presence, things of that nature, but those things were not the impetus for the shootings. There was many, many other things as Mr. Collins has gone through. So in regards to those cases, there is case law specifically saying that those sort of escalation, when you don't negotiate, if you skip those steps and you don't follow the use of force analysis, then you're going, then that weighs against you. And that's what you have in regards to this case. You've also got the Cole v. Hunter case and the Ryars case. These are all cases that talk about, as I stated before, in regards to knives or guns, but there has to be some sort of threat. Now the Casella case is a little bit strange and, you know, while I may agree with some of the analysis of Santamayor in regards to the dissent, you know, it's a very factual case, but not a lot of the facts are developed in regards to the opinion itself. But each case is developed, especially in the area of qualified immunity based on the facts. And in this case, you've got a defendant who is basically making up a story as to what happened, but then changed his story after he saw the video that shows it didn't. You know, there's a lot of fact issues in regards to this case, and if the one thing you're talking about is the perspective of the officer and what he believed, then you have a fact issue in regards to that. Because his own words don't make any sense in his reports, and they're basically a fabrication. So he contradicts himself. So what was going on in his brain is not something that I have to plead or prove, but it's something that would go to a jury. There is definitely a fact issue in regards to that. In their brief, I would state that the defendants at the end said, you know, all this could have been avoided if he had ample opportunity to put the gun down but didn't do that. You know, they had ample opportunity to announce themselves and to do what was right. They could have just as easily come up and said, hey, Sheriff's Department, you know, we're the law enforcement, we just have some questions for you, anything of that nature, and they did nothing. Now while Cass and the other ones may say that, you know, creating a situation where you kind of roll full hardy and someone comes at you with an axe or a sword or whatever, it doesn't justify it in this case. There are fact issues in regards to qualified immunity. It was clearly established, and I appreciate your time. Yes, thank you, Mr. Gale. Your case is under submission, and the court will take a brief recess before hearing the final two cases.